State of Nebraska on behalf of B.M.,
a minor child, appellant, v.
Brian F., appellee.
___ N.W.2d ___

Filed May 16, 2014.    No. S-12-1123.

1. **Modification of Decree: Child Support: Appeal and Error.** Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, an appellate court will affirm the trial court's decision absent an abuse of discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Paternity: Child Support.** Pursuant to Neb. Rev. Stat. § 43-1402 (Reissue 2008), child support in a paternity action is to be determined in the same manner as in cases of a child born in lawful wedlock.

4. **Modification of Decree: Child Support: Proof.** A party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered.

5. **Modification of Decree: Child Support.** Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent.

6. ____: ____. The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child.

7. **Modification of Decree: Child Support: Proof.** The party seeking the modification of child support has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification.

8. **Courts: Jurisdiction.** In civil cases, a court of general jurisdiction has inherent power to vacate or modify its own judgment during the term in which it was issued.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Reversed and remanded for further proceedings.

Kathryn L. Hoyme and Sara E. Preisinger for appellant.

Brian F., pro se.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.
## NATURE OF CASE

Brian F. signed a notarized "Acknowledgement of Paternity" on January 16, 1995, stating that he is the biological father of B.M., the minor child at issue in this case. Shirley M. had given birth to B.M. in August 1994. The State of Nebraska on behalf of B.M. filed a "Petition for Establishment of Paternity and Support" in the district court for Douglas County, and a decree of paternity was filed on July 18, 1996. The decree established Brian as the legal father of the child and ordered him to pay child support. In 2009, Brian's child support payment was ordered increased. Brian testified that he had suspicions he was not the biological father in 1996.

In 2011, Brian sought to modify the child support. He filed pleadings in November 2011 and February and June 2012, seeking to reduce or terminate his child support obligation. During the course of the modification proceedings, genetic testing results excluded Brian as the biological father of B.M. No guardian ad litem was appointed to protect the child. Because of the genetic testing results, in an order filed October 29, 2012, the district court for Douglas County treated the action as a challenge to the acknowledgment, as though pursued under Neb. Rev. Stat. § 43-1409 (Reissue 2008); "[set] aside the finding of paternity," as recommended by the referee; and terminated Brian's child support obligation. The State on behalf of B.M. appeals, claiming, inter alia, that the district court erred when it "void[ed] the determination of paternity . . . and terminat[ed] [Brian's] child support obligation." As explained below, although Brian remains free to do so, the validity of the judgment of paternity has not been attacked by Brian and the State has not agreed to set aside the paternity decree. And although we are not unsympathetic to Brian's current status, we nevertheless must conclude, based on established principles, that the district court erred when it converted the action to modify child support to a disestablishment action and terminated child support based solely on the

results of genetic testing. We therefore reverse the order of October 29, 2012, and remand the cause for a determination of modification of child support.

## STATEMENT OF FACTS

The minor child at issue in this case, B.M., was born in August 1994. Approximately 5 months after the birth of B.M., on January 16, 1995, Brian signed a notarized "Acknowledgement of Paternity," in which he acknowledged that he was the biological father of B.M. On July 18, 1996, a decree of paternity was filed. Under the decree, Shirley was found to be the mother of B.M. The record in the present case suggests that in the paternity action proceeding, the acknowledgment served as a basis for the factual finding that Brian was the biological father and the judgment of paternity established that Brian was the legal father. See Neb. Rev. Stat. § 43-1412 (Cum. Supp. 1996). The decree serves as a judgment. The decree of paternity also ordered Brian to pay child support in the amount of $50 per month and to provide health insurance for B.M. The decree and acknowledgment were received as evidence in the current proceeding to modify support.

On December 15, 2008, the State, which was providing public assistance, filed an application for modification of child support. The district court entered an order on February 18, 2009, increasing Brian's child support payments to $369 per month. Brian testified that he was aware of this child support order because the money was taken out of his paycheck.

On November 17, 2011, Brian, pro se, filed a "Petition for Modification of Child Support." In his petition, Brian alleged that his existing child support obligation created a severe economic hardship and attached a "Child Support Worksheet," outlining his request for a reduction in child support. Brian also made a request for genetic testing. The State filed its answer on January 20, 2012. On February 13, Brian filed another "Petition for Modification of Child Support." The February 13 "Petition for Modification of Child Support" included documentation, including a "Child Support Worksheet," a letter from his employer regarding salary, pay stubs, and letters regarding delinquent taxes. Evidently, the matter was referred to a child

support referee, who, on February 16, ordered genetic testing for Brian, Shirley, and B.M., the results of which excluded Brian as the biological father of B.M.

On June 12, 2012, Brian filed a form titled "Application and Affidavit to Obtain Termination of Child Support" and attached the results of the DNA test. Brian used the Nebraska pro se form which lists the customary reasons for termination of child support, i.e., death, emancipation, or marriage of the child, or the child's attaining the age of 19 years. When Brian filed this application to terminate child support, like an adoptive father, Brian was not a biological father, but he was the legal father.

A hearing was held before a child support referee for the district court on June 25, 2012. At the start of the hearing, the referee stated that "[t]his matter comes on for hearing on a Motion to Terminate Child Support." Brian appeared at the hearing, and he testified under oath in his own behalf. Brian did not claim he had not been intimate with Shirley. Instead, he testified that "sometime around—between '94 and '96," he "had suspicions that [he] was not the father." The DNA test results were received in evidence. The State offered and the referee received the notarized "Acknowledgement of Paternity" signed by Brian. Brian testified that he recognized his signature on the document.

At the close of the June 25, 2012, child support hearing, without reference to the economic situation of the parties or the best interests of the child, the referee recommended terminating Brian's child support obligation, because of the results of the genetic testing. The referee stated that "you're not the dad, so to hold you responsible in the future is unconscionable. So that's what I'm going to recommend." The referee recommended a termination date as of the end of the month in which the results were reported.

The referee's written report filed June 28, 2012, stated that Brian "seeks to terminate his child support obligation based upon genetic testing that excluded him as the biological father of the minor herein." The referee recommended that "the child support obligation should be terminated with the end of the month in which the genetic test results were reported" and

further recommended that the district court "sign an order setting aside the finding of paternity and terminating the child support obligation herein as of May 31, 2012." The child support referee did not base his decision on child support calculations or base his reasoning on Brian's financial situation.

On June 28, 2012, the State filed its exceptions to the referee's findings. The district court held two hearings on the State's exceptions. At no time during the proceedings was a guardian ad litem appointed to represent the child. The first hearing was held on August 3, and Brian appeared pro se. At the August 3 hearing, the State offered and the court received the record of the hearing before the referee, and the court took judicial notice of the court file. The State argued that Brian had signed the notarized "Acknowledgement of Paternity" in 1995 and that Brian has "held himself out to be the legal father of this child. [Brian] has never filed anything to attack or dispute the accuracy of the acknowledgement." The State further argued that

> the law states that the father can still attack the signed acknowledgment. And I believe the statute is . . . § 43-1409. He can attack the acknowledgment stating it was signed . . . through duress or fraud . . . . But it's my understanding that [Brian] has not appeared today stating he signed that acknowledgment due to fraud or duress.

The version of § 43-1409 to which the State referred was enacted in 1997 and generally provides methods to rescind or challenge the acknowledgment, but that after the rescission period, the unchallenged acknowledgment serves as a legal finding of paternity. The State further argued that because Brian signed and had the acknowledgment notarized, his paternity could not be disestablished under Neb. Rev. Stat. § 43-1412.01 (Reissue 2008). Section 43-1412.01, to which the State referred, became operative in 2008 and generally provides for the statutory disestablishment of paternity based on genetic testing, with certain exceptions.

The State also raised an argument based on equity. The State asserted that Brian had "slept on his rights," because he had stated at the hearing before the referee that he suspected as

early as 1996 that he was not the biological father of the child, but he did not take action until now, and that therefore, the court should not find in Brian's favor.

At the August 3, 2012, hearing, the district court stated that it assumed Shirley "knew that she had sex with other people during this time than [Brian]" and asked the State if it had "thought about going after the mother for not telling the truth about this stuff?" There was a discussion regarding the fact that the State could not realistically seek to collect its expenditures from another putative father at this late date, because under Neb. Rev. Stat. §§ 43-512.03 and 43-1411 (Reissue 2008), the State can attempt to collect only until the child turns 18, and B.M. would turn 18 that August.

After the August 3, 2012, hearing, the district court filed an order on August 8. As to Brian's application regarding child support, the order stated that "[d]uring the pendency of this matter, [Brian's] child support obligation is suspended as of May 31, 2012. This Court suspends the child support for good cause shown as [Brian] is not the biological father of the minor child." The order, however, was not limited to child support.

In the August 8, 2012, order, the district court further determined that the disestablishment statute, § 43-1412.01, was not applicable to this case, because Brian signed the acknowledgment in 1995 and § 43-1412.01 did not go into effect until 2008. The district court then stated that the acknowledgment statute, § 43-1409, the rescission or challenge portions of which became law pursuant to 1997 Neb. Laws, L.B. 752, was applicable to this case and that Brian could challenge the acknowledgment by showing fraud, duress, or material mistake of fact under that statute. The court stated that it had found material mistake of fact to be implicit in Brian's applications to reduce or terminate child support and suggested that Brian amend his application to allege fraud, duress, or mistake of fact with specificity. The court gave Brian leave to amend. The district court scheduled another hearing for October 22.

The second hearing before the district court was held on October 22, 2012. Brian stated that he had not filed an

amended complaint as the district court had suggested in its August 8 order, and neither Brian nor the State offered any additional evidence. At the hearing, the State indicated that "[Brian] has failed to do what [the court] asked in [the August 8] order, which was to amend his pleading to include some kind of legal defense or to attack the paternity. He has not alleged fraud or duress at this time." The State reiterated its arguments that Brian had not challenged the acknowledgment under § 43-1409 or sought to disestablish paternity under § 43-1412.01 and that Brian had slept on his rights.

After the October 22, 2012, hearing, the district court filed its second order on October 29. In the order, the district court stated that no additional evidence was offered at the October 22 hearing and the district court determined that "there is no further issue in this matter as the Court has already found and had already agreed with the Referee in this matter." Therefore, the district court accepted the referee's recommendation to "[set] aside the finding of paternity" and further determined that Brian "is not the biological father of the minor child and that his child support obligation is terminated as of May 31, 2012."

The State appeals.

## ASSIGNMENTS OF ERROR

The State claims on appeal that the district court erred when it (1) "void[ed] the determination of paternity . . . and terminat[ed] [Brian's] child support obligation" and (2) "grant[ed] any relief to [Brian] as [Brian] failed to bring the question of paternity in a timely manner."

## STANDARDS OF REVIEW

[1,2] Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, we will affirm the trial court's decision absent an abuse of discretion. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted

for disposition. *Fitzgerald v. Fitzgerald*, 286 Neb. 96, 835 N.W.2d 44 (2013).

## ANALYSIS

Brian brought this action to modify or terminate his child support obligation. Nevertheless, in addition to terminating child support, the district court on its own initiative converted this action for the modification or termination of child support into an action challenging the "Acknowledgement of Paternity" and, further, adopted the child support referee's recommendation to "[set] aside the finding of paternity." We determine that the district court improperly expanded the scope of this action when it converted the matter into an action to disestablish paternity. And, because Brian was still legally the father under the paternity decree, the district court further erred when it terminated child support based solely on the finding that Brian was not the biological father of the child. We reverse the October 29, 2012, order and remand the cause for further proceedings limited to modification of child support.

*Brian, as the Legal Father, Applied to Modify Child Support. The Application to Modify Was Subject to Established Modification Principles.*

The child at issue in this case, B.M., was born in August 1994. In January 1995, Brian signed a notarized acknowledgment, and in July 1996, a decree was filed which found that Brian is the legal father of B.M. Section 43-1409, as it existed when Brian signed the acknowledgment, provided that the "signing of a notarized acknowledgment . . . by the alleged father shall create a rebuttable presumption of paternity as against the alleged father. Such a signed and notarized acknowledgment or a certified copy or certified reproduction thereof shall be admissible in evidence in any proceeding to establish support." § 43-1409 (Cum. Supp. 1996). This version of § 43-1409 creates an evidentiary rebuttable presumption of paternity and provides that the acknowledgment is admissible evidence. Compare *Cesar C. v. Alicia L.*, 281 Neb. 979, 985, 800 N.W.2d 249, 254 (2011) (stating as to later version

of § 43-1409 that "the proper legal effect of a signed, unchallenged acknowledgment of paternity is a finding that the individual who signed as the father is in fact the legal father"). Accordingly, given the unchallenged acknowledgment and the decree, since 1996, there has been a finding of paternity as well as a judgment of paternity, the latter of which established Brian as the legal father.

In the present action, Brian filed applications to modify or terminate his child support obligation starting in November 2011. Brian filed these applications under the same case number, docket 949, No. 623, under which the initial paternity decree was entered and previous modifications of child support have been conducted. The same case number has been utilized because Brian's effort to modify or terminate child support is supplementary to the original proceeding, and not the commencement of a new action. See *State ex rel. Gurnon v. Harrison*, 245 Neb. 295, 512 N.W.2d 386 (1994) (determining that in filiation proceeding, application to modify decree for child support is not independent proceeding or commencement of new action, but, rather, is supplementary to original proceeding).

[3] Brian's applications filed herein were limited to modifying or terminating child support; he did not claim that he wished to challenge the signed, notarized acknowledgment, disestablish paternity, or vacate or set aside the decree of paternity. Pursuant to Neb. Rev. Stat. § 43-1402 (Reissue 2008), child support in a paternity action is to be determined in the same manner as in cases of a child born in lawful wedlock. Section 43-1402 provides in relevant part:

> The father of a child whose paternity is established either by judicial proceedings or by acknowledgment as hereinafter provided shall be liable for its support to the same extent and in the same manner as the father of a child born in lawful wedlock is liable for its support.

See, also, *Henke v. Guerrero*, 13 Neb. App. 337, 692 N.W.2d 762 (2005); *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000). The district court should have treated this action simply as a child support modification case filed by the legal

father "whose paternity [was] established . . . by judicial proceedings." See § 43-1402.

[4-7] We have stated that a party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013); *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). We have stated that

> [a]mong the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. But, the paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child.

*Incontro v. Jacobs*, 277 Neb. at 282-83, 761 N.W.2d at 558. The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Incontro v. Jacobs, supra*. These established principles are applicable to Brian's application to modify or terminate child support.

*The District Court Improperly Expanded the
Child Support Modification Proceedings*.

Actions to determine parental support and paternity are statutory and governed by Neb. Rev. Stat. §§ 43-1401 through 43-1418 (Reissue 2008 & Supp. 2013). In its August 8, 2012, order, the district court discussed its construction of the scope of this action. It referred to both the disestablishment statute, § 43-1412.01, and the acknowledgment statute, § 43-1409.

Section 43-1412.01, operative in 2008, generally provides a statutory remedy by which to set aside a judgment of paternity, thus disestablishing the parent-child relationship, including

where genetic testing excludes the individual as the father. Section 43-1412.01 provides:

> An individual may file a complaint for relief and the court may set aside a final judgment, court order, administrative order, obligation to pay child support, or any other legal determination of paternity if a scientifically reliable genetic test performed in accordance with sections 43-1401 to 43-1418 establishes the exclusion of the individual named as a father in the legal determination. . . . A court shall not grant relief from determination of paternity if the individual named as father (1) completed a notarized acknowledgment of paternity pursuant to section 43-1408.01, (2) adopted the child, or (3) knew that the child was conceived through artificial insemination.

Brian did not seek to utilize this statute, and we believe that neither disestablishment nor the setting aside of the decree was at issue in the case. The district court concluded that based on ex post facto principles, § 43-1412.01 was not applicable.

After determining that § 43-1412.01 was not applicable to this case, the district court considered the acknowledgment statute, § 43-1409, as it has essentially existed since 1997. This version of § 43-1409 provides in part:

> The signing of a notarized acknowledgment, whether under section 43-1408.01 or otherwise, by the alleged father shall create a rebuttable presumption of paternity as against the alleged father. The signed, notarized acknowledgment is subject to the right of any signatory to rescind the acknowledgment within the earlier of (1) sixty days or (2) the date of an administrative or judicial proceeding relating to the child, including a proceeding to establish a support order in which the signatory is a party. After the rescission period a signed, notarized acknowledgment is considered a legal finding which may be challenged only on the basis of fraud, duress, or material mistake of fact with the burden of proof upon the challenger, and the legal responsibilities, including the child support

obligation, of any signatory arising from the acknowledg-
ment shall not be suspended during the challenge, except
for good cause shown.

Brian did not seek to utilize § 43-1409, and we believe that
rescission of the acknowledgment was not an issue in the case.
Referring to the post-1997 version of § 43-1409, the district
court concluded in its August 8, 2012, order that "[t]he stat-
ute that is applicable is section 43-1409 [as initially enacted
in 1997]." The district court erred when it concluded that
§ 43-1409 applied to this case, and we add, parenthetically,
that had rescission of the acknowledgment been at issue, the
1995 version, not the post-1997 version, of § 43-1409 would
have applied.

In its August 8, 2012, order, the district court used the provi-
sions of the post-1997 version of § 43-1409 as its framework.
Under this version of the statute, a notarized unchallenged
acknowledgment is considered a legal finding of paternity. The
district court reasoned that even though Brian had not attacked
the acknowledgment, because the genetic testing results
excluded Brian as the biological father of B.M., a "material
mistake of fact is implicit in the [child support modification]
allegations of [Brian]." The district court gave Brian leave to
amend and suggested "there may be allegations of fraud and
duress that [Brian] may wish to allege and he may also wish
to allege more specificity with regard to the mistake of fact."
The addition of these allegations would mirror the post-1997
version of § 43-1409.

Notwithstanding the district court's suggestion,
Brian did not amend his pleadings and did not challenge
the "Acknowledgement of Paternity" under § 43-1409.
Nevertheless, in its October 29, 2012, order, the district court
stated that it

found that there is no further issue in this matter as the
Court has already [on August 8] found and had already
agreed with the Referee in this matter. As such, the
Referee's decision [which included the recommendation
that the district court enter an order setting aside the
finding of paternity] is hereby re-affirmed and the Court

> accepts the Referee's decision and finds that [Brian] is
> not the biological father of the minor child and that his
> child support obligation is terminated as of May 31, 2012.
> Any arrearage that was accrued prior to May 31, 2012 is
> still to be paid by [Brian].

The State has appealed from the October 29 order in general
and specifically asserts that by adopting the child support ref-
eree's recommendation to "[set] aside the finding of paternity,"
the district court improperly voided the determination of pater-
nity. We agree with the State.

Brian's pleadings indicate that because he believed genetic
testing would show that he was excluded as the biological
father of B.M., his child support obligation should be reduced
or terminated. He also attached financial information to support
a modification based on economic hardship. His applications
made no reference to the acknowledgment, see § 43-1409,
disestablishment as a concept, see § 43-1412.01, or the sug-
gestion that the decree of paternity should be set aside or
vacated. Compare, *In re Interest of Kodi L.*, 287 Neb. 35, 840
N.W.2d 538 (2013) (challenger specifically invoked § 43-1409
in challenge to acknowledgment under § 43-1409); *Alisha C. v.
Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012) (ex-husband
invoking § 43-1412.01 could attempt to overcome marital
presumption of paternity in dissolution decree by seeking to
disestablish under § 43-1412.01).

As we noted above, actions to determine paternity and
parental support are governed by §§ 43-1401 through 43-1418.
We have recognized that paternity proceedings are purely statu-
tory and that because the statutes regarding paternity proceed-
ings modify the common law, they must be strictly construed.
See *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999).
In *Cross*, we stated:

> This court has long recognized that paternity proceed-
> ings "are purely statutory and the courts can try such
> issues and make such orders, in them, as the statute con-
> templates and none other." *Peters v. Killian*, 63 Neb. 57,
> 58, 87 N.W. 1049, 1050 (1901). At common law, the father
> of a child born out of wedlock had no legal obligation to
> support the child; that common-law rule was changed by

legislative action. *Carlson v. Bartels*, 143 Neb. 680, 10 N.W.2d 671 (1943). Statutes which modify or abrogate the common law are to be strictly construed. *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999). This court has held that relief in paternity actions is limited to that provided in the statutes. See, *Paltani v. Creel*, 169 Neb. 591, 100 N.W.2d 736 (1960); *Timmerman v. Timmerman*, 163 Neb. 704, 81 N.W.2d 135 (1957).

257 Neb. at 780, 600 N.W.2d at 784.

We recognize that *Cross* was decided before we adopted the liberalized rules of notice pleading, so its strength to the extent it applies to the pleading practice in paternity proceedings is in doubt. We have explained more recently in *Mahmood v. Mahud*, 279 Neb. 390, 396, 778 N.W.2d 426, 431 (2010), how a trial court should consider a party's request for relief under liberalized pleading, and stated that "[p]laintiffs are not required to plead legal theories or cite appropriate statutes . . . ." In *Mahmood*, the plaintiff sought a domestic abuse protection order, but the trial court issued a harassment protection order. In affirming the order, we recognized that the technical difference between a domestic abuse protection order and a harassment protection order was subtle, albeit similar, and that the thrust of the plaintiff's petition had nevertheless conveyed the plaintiff's claim.

In the present case, the district court, evidently applying liberal pleading concepts, found that Brian's modification of child support applications were implicitly seeking to disestablish his parent-child relationship with B.M. To strengthen its reading of the applications, the district court suggested that Brian amend his application by making specific allegations. Upon Brian's failure to amend, and without the State's agreement, the district court nevertheless set aside the finding of paternity. Compare *State on behalf of L.L.B. v. Hill*, 268 Neb. 355, 356, 682 N.W.2d 709, 711 (2004) (stating in paternity case involving child support arrearages that "[t]he State on behalf of [the child] does not contest the vacation of the paternity determination"). With respect to the practice employed by the district court, we have stated that a "trial judge may on occasion hasten the process along by suggesting to one party

that he or she will favorably entertain a particular pleading. Nevertheless, that practice is to be discouraged." *Jim's, Inc. v. Willman*, 247 Neb. 430, 434, 527 N.W.2d 626, 630 (1995), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002). The concurring opinion in *Jim's, Inc.* states that the practice should be "condemned" and "prohibited." 247 Neb. at 435, 527 N.W.2d at 630 (Caporale, J., concurring).

Unlike the subtle distinctions between a domestic abuse protection order and a harassment protection order at issue in *Mahmood*, there can be no confusion between or equating of an application to reduce monetary support for a child and an application to sever the legal relationship between a parent and child. The remedies are vastly different. To read a disestablishment action into a modification for child support application takes a lighthearted view of terminating a most important legal and social relationship. Even under liberal pleading practice, we cannot endorse the severing of the parent-child relationship simply because a party appears before a fact finder who sympathetically expands the action. As reflected in our discussion below regarding vacating judgments, we do not think it is prudent to invite adjudicated fathers who are subject to the pre-1997 version of § 43-1409, to sever their parent-child relationship merely by filing any pleading to which the results of genetic testing are attached.

Disestablishing the parent-child relationship has consequences. Although not brought on as a disestablishment matter, in the context of termination of parental rights, it has been stated that

> termination of the legal relationship between parent and child is a grave proceeding. A court order terminating parental rights renders the parent "a legal stranger to the child" and severs "all parental rights." . . . The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself.

*Weaver v. Roanoke Dept. of Human Res.*, 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980) (citations omitted). See, also, *Roth v. Weston*, 259 Conn. 202, 231, 789 A.2d 431, 448

(2002) (stating that termination of parental rights "is the *complete severance* by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent") (emphasis in original). We recognize that the record in the present case indicates that there is no social relationship between Brian and B.M. Nevertheless, we have recognized that a child can be harmed when a father seeks to set aside paternity. See *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012). The legal effect of disestablishment can cut off inheritance. See Neb. Rev. Stat. §§ 30-2201 to 30-2902 (Reissue 2008, Cum. Supp. 2012 & Supp. 2013). And, as this case illustrates, a delay in seeking to disestablish can hinder the State's support collection process. See §§ 43-512.03 and 43-1411. Thus, although notice pleading has liberalized requirements, it is not without limits. See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 at 197 (3d ed. 2004) (recognizing that even though pleading rules are generally less stringent for pro se litigants, "there are limits"). See, also, *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that "[p]rinciples requiring generous construction of *pro se* complaints are not . . . without limits" and that while trial courts are to construe pro se complaints liberally, they are not required to "conjure up questions never squarely presented to them"). The district court erred when it expanded the child support modification proceeding.

Although we believe that the proceeding should have been limited to ruling on modification of child support, we are aware that the dissent has concluded that Brian's applications should be viewed as constructively amended and liberally construed as a disestablishment case and that the district court properly addressed and correctly decided such issue. Relying on § 43-1409 as it existed when Brian signed the acknowledgment, the dissent reasons that, given the results of the genetic testing, Brian has "rebutted the presumption of paternity [in § 43-1409], [and] he had no obligation to continue paying child support and the State had no right to seek it." The dissent adds that the "State may not continue to seek support from an unmarried father who rebuts a presumption

of paternity." Implicit in the dissent's reasoning is the proposition that when the presumption of paternity in the pre-1997 version of the acknowledgment is rebutted, there is no longer a legal basis for child support. But the source of the child support obligation in this case is not the acknowledgment, but, rather, the decree of paternity and support, and the decree has not been vacated. We do not believe that rebutting or collaterally attacking the facts in an acknowledgment which served as a basis for the factual finding that Brian was "actually the father" in the paternity action is tantamount to vacating the decree containing the judgment that Brian is the legal father and ordering child support. See § 43-1412(1).

In this case, the district court found that Brian was not the biological father and set aside a finding of paternity. Under the dissent's view, if the court finds the individual is not the biological father, the judgment of paternity and child support evaporates. To the contrary, however, a finding that an individual is not a biological father is not the equivalent of a finding that an individual is not the legal father. To overcome the judgment which established Brian as the legal father, Brian would need to set aside the judgment, which he remains eligible to attempt.

The disestablishment statute, § 43-1412.01, was enacted in 2008, and we make no comment regarding its application or availability to Brian. In order for Brian to disestablish under non-§ 43-1412.01 principles, Brian would need to overcome the "res judicata" effect of the finding that Brian is the legal father in the judgment of paternity and child support and to take steps to vacate the judgment of paternity. See *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012) (stating that to overcome res judicata effect of presumption of paternity in dissolution decree, legal father would need to take steps to vacate decree). Even under liberal pleading principles, we cannot—knowing that the State objects to voiding paternity—agree to read Brian's applications to modify or terminate child support as pleadings seeking to vacate the decree of paternity.

Our case of *State on behalf of L.L.B. v. Hill*, 268 Neb. 355, 682 N.W.2d 709 (2004), is instructive and consistent with our

analysis. In *Hill*, we applied equitable principles and stated that because of an adjudicated father's "inexcusable lack of diligence," 268 Neb. at 360, 682 N.W.2d at 713, the trial court's decision to vacate his child support arrearages should be reversed. Although the question on appeal was limited to an issue involving child support arrearages, *Hill* illustrates the appropriate procedural approach to be followed in the instant case.

In *Hill*, an individual who had been determined to be the legal father in a paternity decree in 1996 sought to be relieved of child support obligations in 2002, based on genetic testing showing he was not the biological father. In *Hill*, we stated that "[i]n 2002, DNA tests showed that [the individual] was not [the child's] father, and [the individual] moved to vacate the paternity decree." 268 Neb. at 356, 682 N.W.2d at 710-11. Elsewhere in the opinion, we stated that in 2002, the individual also "filed a motion to terminate [child support]." *Id*. at 357, 682 N.W.2d at 711. In *Hill*, we stated that "[t]he court granted the motion and vacated the decree, as well as child support arrearages. The State on behalf of [the child] does not contest the vacation of the paternity determination and concedes that [the individual] should not be liable for future child support." 268 Neb. at 356, 682 N.W.2d at 711. The foregoing facts from our 2004 opinion demonstrate that for an individual determined to be the legal father in 1996—before the 1997 revisions to the acknowledgment statute, § 43-1409, and the 2008 passage of the disestablishment statute, § 43-1412.01—the recognized method was to file a discrete motion to vacate the paternity decree. In *Hill*, a discrete motion to vacate the decree was filed and granted and the district court and parties recognized the necessity of deciding the individual's motion to set aside the paternity decree before terminating child support based solely on genetic testing results. The district court granted the unmarried father's motion to vacate the paternity decree, thus eliminating the individual's status as the legal father, and then granted his motion to terminate child support which had been ordered during the time the individual was the legal father. The procedure was embraced by the district court, the parties, and this court.

[8] It has been observed that "finality of judgments is an important concept in our system of jurisprudence, because it enables the parties to litigation to know once and for all their rights and obligations." *Dougherty v. Swift-Eckrich, Inc.*, 4 Neb. App. 653, 658, 547 N.W.2d 522, 525 (1996). Nevertheless, in civil cases, a court of general jurisdiction has inherent power to vacate or modify its own judgment during the term in which it was issued. *Fitzgerald v. Fitzgerald*, 286 Neb. 96, 835 N.W.2d 44 (2013). The paternity decree was filed in 1996, so this avenue is not available to Brian. The district court's inherent power to vacate the judgment, as extended by statute, has also expired. See Neb. Rev. Stat. § 25-2001(1) (Reissue 2008). Another avenue to vacate a paternity judgment might include § 25-2001(4)(c), providing for relief from fraud by the successful party or relief due to "newly discovered material evidence which could neither have been discovered with reasonable diligence before trial nor have been discovered with reasonable diligence in time to move for a new trial." The standard for showing fraud or newly discovered evidence is high. *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012). Another avenue sometimes available is to invoke the concurrent independent equity jurisdiction of the court which allows the court to modify its own decree. See, e.g., *State on behalf of L.L.B. v. Hill*, 268 Neb. 355, 682 N.W.2d 709 (2004). In the dissolution of marriage context of *Alisha C.*, we stated that "[t]here are no published cases in Nebraska where a paternity determination in a dissolution and support decree was set aside under the court's independent equity jurisdiction." 283 Neb. at 347, 808 N.W.2d at 882.

The dissent, perhaps recognizing the necessity to set aside the decree in order to vacate the legal finding of paternity, concludes that "the obvious remedy, for petitioners like Brian at least, is § 43-1409, as it existed in 1995." That statute provided in its entirety as follows:

> The signing of a notarized acknowledgment, whether under section 43-1408.01 or otherwise, by the alleged father shall create a rebuttable presumption of paternity as against the alleged father. Such a signed and notarized acknowledgment or a certified copy or certified

reproduction thereof shall be admissible in evidence in
any proceeding to establish support.

This statute is merely an evidentiary presumption. See, also,
§ 43-1412(1) (providing for admissibility of acknowledgment
in proceeding to establish paternity). Further, unlike the 1997
and later versions of § 43-1409 which provide a method
to rescind or challenge acknowledgments and state that an
unchallenged acknowledgment "is considered a legal finding"
of paternity, the above-quoted statutory language does not in
and of itself serve to make the acknowledgment a legal find-
ing of paternity. The finding of paternity in the instant case is
found in the decree; the pre-1997 version of § 43-1409 is not
the vehicle to undo the judgment—although it may be help-
ful with respect to evidentiary matters in a proper proceeding
in which the judgment is sought to be set aside. We strictly
construe paternity statutes, and we are not inclined to create
a novel remedy by broadly reading an evidentiary paternity
statute. Section 43-1409 as it existed in 1995 does not create a
remedy to vacate the judgment of paternity. In sum, unlike the
district court and the dissent, we do not read Brian's applica-
tions to modify or terminate child support as seeking dises-
tablishment nor do we read them as urging the court to vacate
its judgment of paternity for purposes of disestablishing his
parent-child relationship with B.M.

*The Only Issue Before the District Court Was*
*Modification of Child Support. We Discuss*
*the Relevance of Genetic Testing Results.*

Brian was found to be the legal father in the decree entered
on July 18, 1996, and ordered to pay child support. The dis-
sent aptly characterizes Brian's June 12, 2012, pleading as his
"application to terminate his child support obligation based on
genetic testing." It is not uncommon for an individual such as
Brian to assert that because DNA testing excludes him as the
biological father of a child, his court-ordered child support
obligation should be reduced or terminated. However, nothing
in our case law, the Nebraska statutes, or the Nebraska Child
Support Guidelines indicates that genetic testing excluding
a legal father as the biological father of a child is sufficient

evidence standing alone to establish a material change in circumstances warranting the modification or termination of child support which has previously been ordered in an existing paternity and child support judgment.

There is jurisprudence elsewhere regarding the significance of DNA results in an action to modify child support. The law has been summarized as follows:

> Results of DNA testing showing that the adjudicated father is not the child's biological father does not, by itself, constitute sufficient evidence to establish a material and substantial change in circumstances warranting modification or termination of the [child] support obligation, or that the support modification is in the child's best interests.

14 C.J.S. *Children Out-of-Wedlock* § 126 at 426 (2006). We agree with the foregoing statement of the law. See, also, *In re J.I.Z.*, 170 S.W.3d 881 (Tex. App. 2005).

Much like the instant case, in *In re J.I.Z.*, an adjudicated father moved to modify child support payments after obtaining DNA test results that excluded him as the child's biological father, and the trial court granted his motion and reduced his child support payments to zero. In reversing the trial court's decision, like us, the Texas Court of Appeals reasoned that the adjudicated father "should not . . . be allowed to avert his duty of support by filing a motion to decrease his support payments to zero on the basis of DNA results without first overturning the parentage judgment or terminating his parentage." *Id.* at 884. Focusing on the child support issue, the appellate court determined that the adjudicated father did not provide evidence to establish a material and substantial change in circumstances to warrant a modification of child support to zero. The appellate court stated that it was "not free to adopt a rule that would allow an adjudicated father to be relieved of his support obligations simply by coming forward with DNA evidence post-decree that tends to exclude him as the biological father." *Id.* at 885. See, also, *In re T.S.S.*, 61 S.W.3d 481 (Tex. App. 2001).

In another modification of child support case, it was observed:

Continuation of a support obligation after an adjudicated father discovers that he is not the child's biological father may be "unjust or inappropriate," and the elimination of that obligation will be in the best interest of the obligor/father. Modification of support, however, does not alter the legal relationship between the parties, and the trial court must also find that modification is in the child's best interest.

*Leguillon v. Leguillon*, 124 Ohio App. 3d 757, 765, 707 N.E.2d 571, 577 (1998). We agree with the reasoning in the foregoing decisions and apply such reasoning to this case. It was an abuse of discretion to terminate child support based solely on genetic test results when the child support obligation had its origins in the unchallenged judgment of paternity.

## CONCLUSION

In a decree entered on July 18, 1996, Brian was found to be the legal father of B.M. and ordered to pay child support. Brian testified he had suspicions he was not the biological father in 1996, but he waited until 2011 to satisfy his curiosity. The passage of time complicates the resolution of this appeal. Although Brian remains free to do so, no application to vacate the decree establishing Brian as the legal father has been filed by Brian, and the validity of this judgment has not been challenged. No guardian ad litem was appointed to protect the child's interests. The district court erred when it terminated the child support obligation of the legal father, Brian, based solely on the finding that Brian was not the biological father of B.M. The district court further erred when, on its own initiative, it expanded this proceeding for a modification or termination of child support into a challenge to the "Acknowledgement of Paternity" under the post-1997 version of § 43-1409 and treated the matter as a disestablishment case and set aside the finding of paternity. Although we are not unsympathetic to Brian's current status, for the reasons explained in the above analysis, we reverse the October 29, 2012, order of the district court in which the court treated this modification of child support proceeding as a successful challenge to the acknowledgment, adopted the child support referee's recommendation to

"[set] aside the finding of paternity," and terminated Brian's child support obligation. The cause is remanded for a determination of modification of child support consistent with this opinion.

Reversed and remanded for further proceedings.

Stephan, J., concurring.

I do not necessarily agree with the majority's premise that the district court should have treated this action only as a child support modification case and, therefore, erred in considering disestablishment of Brian's paternity. While I concede it is difficult to determine from the pleadings the precise remedy Brian sought to employ, it is clear enough that he challenged the fact of his paternity based upon the DNA test results. But I agree that the judgment of the district court must be reversed, because there is no legal basis in the record before us for vacating the 1996 judgment which determined that Brian was the father of the child.

The court is in apparent agreement that the record affords no basis for vacating the judgment of paternity under Neb. Rev. Stat. § 25-2001 (Reissue 2008), Neb. Rev. Stat. § 43-1412.01 (Reissue 2008), the post-1997 version of Neb. Rev. Stat. § 43-1409 (Reissue 2008), or the equity jurisdiction of the district court. For the reasons stated in the majority and separate concurring opinions, I agree that § 43-1409 as it existed in 1995 did not provide a remedy but was only an evidentiary presumption which merged into the judgment of paternity. When a judgment becomes final, it is simply too late to rebut an evidentiary presumption upon which it is based. Were that not so, and if parties were free to challenge a judgment years after its entry simply by showing that the underlying facts are different than what the court determined them to be, no judgment would ever be final.

That said, I do not particularly like the result which the court reaches in this case. It is logical and fair that a man who can conclusively prove that he is not the biological father of a child and has never assumed a paternal role in the child's life should not be required to pay child support. Were this a case involving a determination of paternity in the first instance,

that is the result which the law would compel us to reach. But here, Brian seeks to disprove paternity after a final judgment declared him to be the father of the child. He can only prevail by having that judgment vacated so as to disestablish his paternity, and on the record before us, he has not presented any legal basis for doing so. In my view, this court should not bend long-settled law regarding the finality of judgments in order to reach what I acknowledge would be the better result in this case.

HEAVICAN, C.J., joins in this concurrence.

CASSEL, J., concurring.

I write separately primarily to emphasize my respectful disagreement with the dissent's central premise: "Under the 1995 version of the statute,[1] if Brian rebutted the presumption of paternity, he had no obligation to continue paying child support and the State had no right to seek it." Contrary to the dissent's premise, the presumption was merely an evidentiary device that merged into the judgment entered on July 18, 1996. From that point forward, the *judgment* finally determined the issue of Brian's legal status as father. Unless and until the controlling judgment is properly vacated or modified in an appropriate proceeding, Brian's legal status as father continues unchanged.

Under the statutes as they existed at the time, Brian's signed acknowledgment of paternity created an evidentiary presumption. The statute relied upon by the dissent contains two sentences. The first sentence states, "The signing of a notarized acknowledgment . . . by the alleged father shall create a rebuttable presumption of paternity as against the alleged father."[2] A rebuttable presumption is generally defined as a presumption that can be overturned upon the showing of sufficient proof.[3] In most instances, a presumption imposes on the party against whom it is directed the

---

[1] Neb. Rev. Stat. § 43-1409 (Cum. Supp. 1996).

[2] *Id.*

[3] *Dawes v. Wittrock Sandblasting & Painting*, 266 Neb. 526, 667 N.W.2d 167 (2003), *disapproved in part on other grounds, Kimminau v. Uribe Refuse Serv.*, 270 Neb. 682, 707 N.W.2d 229 (2005).

burden of proving that the nonexistence of the presumed fact is more probable than its existence.[4] The second sentence of the statute confirms its evidentiary character by making the acknowledgment "admissible in evidence in any proceeding to establish support."[5]

The statutes then creating the action for determination of paternity and support fortify the presumption's evidentiary status. One statute authorized a "civil proceeding to establish the paternity of a child."[6] The next statute specified procedures in such actions.[7] The method of trial was to be "the same as that in other civil proceedings."[8] The alleged father and mother were declared "competent to testify."[9] In specified instances, uncorroborated testimony was deemed insufficient to support a finding or verdict of paternity.[10] But most important to the case before us, the acknowledgment was declared to be "admissible in evidence in any proceeding to establish paternity without the need for foundation testimony or other proof of authenticity or accuracy."[11] This makes it abundantly clear that, at the time, an acknowledgment in a paternity proceeding functioned as a piece of *evidence*.

Brian had his opportunity to rebut the presumption in the proceedings leading to the entry of the 1996 decree. Brian does not argue that the district court lacked either subject matter or personal jurisdiction. The decree recited that Brian failed to answer or otherwise plead and failed to appear at trial. There is nothing in the record to dispute that recitation. The procedural statute proclaimed the consequences: "If it is determined in [the establishment] proceeding that the alleged father is

---

[4] See, Neb. Evid. R. 301, Neb. Rev. Stat. § 27-301 (Reissue 2008); *Dawes, supra* note 3.

[5] § 43-1409.

[6] Neb. Rev. Stat. § 43-1411 (Cum. Supp. 1994).

[7] Neb. Rev. Stat. § 43-1412 (Cum. Supp. 1996).

[8] § 43-1412(1).

[9] *Id*.

[10] See *id*.

[11] See *id*.

actually the father of the child, a judgment shall be entered declaring the alleged father to be the father of the child."[12] The court entered the judgment, i.e., the decree.[13] The judgment declared Brian to be the father. No appeal was taken. Brian failed to rebut the presumption when he had the opportunity to do so. The function of the acknowledgment ceased when the judgment came into existence.

A "judgment" is a court's final consideration and determination of the respective rights and obligations of the parties to an action as those rights and obligations presently exist.[14] Upon the entry of judgment and passage of the appeal time, the evidence supporting the judgment no longer mattered. From that point forward, the judgment became controlling in establishing Brian as the child's legal father.

Over 15 years later, Brian sought modification of support. At this point, the presumption of the acknowledgment had no purpose. It had long been replaced by the paternity judgment. As the judgment approached its 16th anniversary, Brian filed another pleading, using a standard form for termination of child support. But this form, no matter how liberally construed, did not seek vacation or modification of the judgment declaring him to be the father of the child.

Even if the standard form could be read as an attempt to invoke the remedy enacted in 2008,[15] the district court clearly did not believe that it was proceeding under that section. The court's August 8, 2012, order stated that the new statute was "not applicable to the situation at bar, otherwise it would be an ex post facto law." But more important, where an individual seeks to implement this remedy, the statute expressly requires the court to "appoint a guardian ad litem to represent the interest of the child."[16] During the proceedings leading

---

[12] See *id.*

[13] See *Federal Land Bank v. McElhose*, 222 Neb. 448, 384 N.W.2d 295 (1986) (judgment of court of equity is called decree).

[14] *Fitzgerald v. Community Redevelopment Corp.*, 283 Neb. 428, 811 N.W.2d 178 (2012).

[15] See Neb. Rev. Stat. § 43-1412.01 (Reissue 2008).

[16] *Id.*

to this appeal, the court did not appoint a guardian ad litem. Consequently, the court was not proceeding under this statute, even if we assume that this remedy would otherwise have been available.

I now turn to the first of two other aspects of the dissent meriting attention. The dissent cites several cases[17] for the proposition that "setting aside a paternity decree under a district court's equity jurisdiction is contrary to our cases holding that equitable relief is not available under the paternity statutes." But none of the cited cases involves setting aside a judgment or decree. Each addresses the relief available in an action to determine paternity. In one case, a man unsuccessfully attempted to use an equitable action to have himself declared the father of two children born out of wedlock.[18] In a different case—a divorce action where the nullity of the marriage was decreed—the statute then allowed the court to make provision for the care, custody, and maintenance of the children of the parties and this court affirmed, after noting that the court would not have had the authority to entertain an independent action to determine the paternity of a child born out of wedlock.[19] In the final case, this court held that an action in equity could not be maintained against the representative of the estate of a deceased alleged father by children born out of wedlock to obtain money for their support, maintenance, and education for the period subsequent to the father's death.[20] None of the cases cited by the dissent hold, or even suggest, that the ordinary powers and remedies regarding vacating of a judgment do not apply to a judgment of paternity under § 43-1412.

The framework for a district court to vacate or modify its own judgment is so well known that it hardly requires

---

[17] *Paltani v. Creel*, 169 Neb. 591, 100 N.W.2d 736 (1960); *Timmerman v. Timmerman*, 163 Neb. 704, 81 N.W.2d 135 (1957); *Carlson v. Bartels*, 143 Neb. 680, 10 N.W.2d 671 (1943).

[18] See *Paltani, supra* note 17.

[19] See *Timmerman, supra* note 17.

[20] See *Carlson, supra* note 17.

citation. In one of our most recent cases, we reviewed the court's authority to do so.[21] First, in civil cases, a court of general jurisdiction has inherent power to vacate or modify its own judgment at any time during the term in which the court issued it.[22] One subsection of a statute provides for the exercise of this inherent power after the end of the term upon a motion filed within 6 months after the entry of judgment.[23] Another subsection of the same statute authorizes a district court to vacate or modify its own judgments or orders, after term, upon one or more specified grounds.[24] Finally, a district court has the power to vacate or modify a judgment after term under the court's independent equity jurisdiction.[25] Of course, equitable remedies are generally not available where there exists an adequate remedy at law.[26] And any litigant who seeks equity must herself do equity.[27]

Finally, I address the dissent's assertion that "if no procedure existed for challenging a paternity finding, then in 2008, the Legislature had no need to prohibit a court from granting relief from a determination of paternity if the petitioner had signed an acknowledgment."[28] The dissent errs in two aspects.

First, the dissent's premise is incorrect. A procedure did exist. As I have already expounded, the district court's jurisdiction to vacate or modify its own judgments is well settled. But while a procedure existed prior to the 2008 amendment, the likelihood of successfully challenging a paternity finding was quite small as a result of two decisions of this court. First,

---

[21] See *Carlson v. Allianz Versicherungs-AG*, 287 Neb. 628, 844 N.W.2d 264 (2014).

[22] *Id*.

[23] See, Neb. Rev. Stat. 25-2001(1) (Reissue 2008); *Carlson, supra* note 21.

[24] See, § 25-2001(4); *Carlson, supra* note 21.

[25] See, *Carlson, supra* note 21; *Roemer v. Maly*, 248 Neb. 741, 539 N.W.2d 40 (1995).

[26] *Carlson, supra* note 21.

[27] *Roemer, supra* note 25.

[28] See § 43-1412.01.

in *DeVaux v. DeVaux*,[29] we held that a finding of paternity in a decree dissolving a marriage prevented the parties from relitigating paternity. Second, in *McCarson v. McCarson*,[30] we held that an allegation of fraud on the part of the mother at the time of the decree was sufficient to overcome a demurrer to the father's attempt to invoke § 25-2001(4) to modify the decree adjudicating his paternity. But as we noted in *McCarson*,[31] the statutory remedy was only available for 2 years after the judgment was rendered or made. Thus, while a statutory remedy existed, it was very narrow.

Second, the 2008 statute[32] was clearly driven by the limited procedures available to challenge a finding of paternity. It may be that the Legislature also recognized that a 1997 amendment to § 43-1409[33] designated a signed and notarized acknowledgment, after a rescission period, as a "legal finding which may be challenged only on [specified grounds]." Indeed, we later observed that a judicial proceeding was not needed to establish a child's paternity where a properly signed and notarized acknowledgment legally established the father's paternity as to the child specified in the acknowledgment.[34] Obviously, our jurisprudence regarding vacating or modifying judgments would not apply to a "legal finding" created without a judicial proceeding. The Legislature may have recognized that because it had created such an extra-judicial finding, it also needed to create a remedy for setting aside such a determination. The 2008 amendment more broadly enabled challenges to paternity findings originating from either judicial proceedings or the 1997 amendment to § 43-1409.

---

[29] *DeVaux v. DeVaux*, 245 Neb. 611, 514 N.W.2d 640 (1994) (superseded by statute as stated in *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012)).

[30] *McCarson v. McCarson*, 263 Neb. 534, 641 N.W.2d 62 (2002) (superseded by statute as stated in *Alisha C., supra* note 29).

[31] *Id*.

[32] § 43-1412.01.

[33] See § 43-1409 (Reissue 1998).

[34] *Cesar C. v. Alicia L.*, 281 Neb. 979, 800 N.W.2d 249 (2011).

Of course, the 1997 amendment did not apply to the case before us, where the paternity judgment was entered in 1996. Brian's legal status as father was established by the 1996 judgment rather than the signed acknowledgment.

While I understand the dissent's concern about requiring Brian to pay support for a child that genetic testing apparently establishes was not his biological offspring, the dissent too lightly dismisses the consequences to the child from a termination of the legal relationship of parent and child. This relationship is constitutionally protected.[35] Both parents and their children have cognizable substantive due process rights to the parent-child relationship.[36] The dissent would approve a procedure that failed to protect the child's rights. I cannot do so.

---

[35] See *In re Interest of Meridian H.*, 281 Neb. 465, 798 N.W.2d 96 (2011).

[36] *Id.*

Connolly, J., dissenting.

Brian raised his claim that he was not the minor's biological father. The State acknowledged his claim and litigated the issue. The referee concluded that Brian had proved he was not the minor's father. He recommended that the district court enter an order to set aside the paternity finding. The district court agreed that Brian was not the father and terminated his child support obligation. Yet the majority opinion, through a series of legal contortions, manages to avoid the issue that the parties tried.

Neither the State nor the majority dispute the court's finding that Brian is not the minor's father. It is true that only a little more than a year's child support obligation is at issue. But the incorrect pleading rules that the majority applies to reverse the court's judgment are no small matter. I cannot join in that opinion.

I do not agree that Brian failed to directly attack the judgment of paternity. His pro se form petition requested a reduction in the amount of his obligation *and* genetic testing. We do not have a transcript of the hearing on his motion for genetic testing, but after a hearing, a referee granted Brian's

request, with the costs taxed to Brian. In May 2012, the State reported to Brian that he was not the minor's biological father. Crucially, the majority acknowledges that a month later, on June 12, 2012, Brian filed a pro se form entitled "Application and Affidavit to Obtain Termination of Child Support." But Brian did not check any box on the form corresponding to the stated reasons for terminating his support obligation. Instead, he wrote in "Genetic Testing attached," which referred to the State's May report that he was not the minor's biological father.

The district court's order characterized Brian's pleadings as follows:

> On November 17, 2011, [Brian] filed a Petition for Modification of Child Support. In that Petition, [he] requested that there be a DNA test on the minor child to determine whether [he] was the biological father of the minor child. [He] *also* requested a reduction in child support due to his reduction in income.

(Emphasis supplied.) Clearly, the district court viewed Brian's pleadings as asserting alternative claims for relief: (1) a claim for a reduction of the support obligation because of a change in income and (2) a claim for termination of support because he was not the minor's father. Of course, our pleading rules permit a party to raise separate, and even inconsistent, claims.[1]

Equally important, the State litigated whether Brian's paternity should be disestablished. At the start of the hearing before the referee, he stated that he was conducting a hearing on Brian's motion to terminate his child support obligation. The State responded as follows: "Your honor, the State would object to the Motion to Terminate in what appears to be a motion to disestablish." But the State objected to the motion on the merits, not as beyond the scope of Brian's pleading or the court's authority to address. The State defended against Brian's claim and presented evidence on his signed acknowledgment. The referee's report stated that the matter before it

---

[1] See *TFF, Inc. v. SID No. 59*, 280 Neb. 767, 790 N.W.2d 427 (2010), citing Neb. Ct. R. Pldg. § 6-1108(e)(2).

was Brian's "'Application and Affidavit to Obtain Termination of Support.'"

Moreover, in response to the referee's report, the State took "exception to the recommendation of the Referee regarding the Motion for *Termination of Support and Disestablishment* filed by [Brian]." (Emphasis supplied.) The State further litigated Brian's claim to disestablish his paternity before the district court.

The State does not claim on appeal that the disestablishment issue is not properly before us. It indisputably knew the issue that it was litigating. And both the referee and the district court reached decisions based on Brian's June 12, 2012, pleading—his application to terminate his child support obligation based on genetic testing. Obviously, even if his original petition were not clear enough to raise his claim to disestablish paternity, the pleadings were constructively amended by his June 12 pleading and the State's implied consent to litigate that issue.[2] It is inconsistent with rule 15(b) of the Nebraska Court Rules of Pleading in Civil Actions[3] for an appellate court to disregard the result of a trial when the parties agreed to try the issue.[4] So the majority opinion's focus on rules for a modification of a support obligation is irrelevant. Because the court concluded that Brian successfully disestablished his paternity, it had no need to consider whether to modify his support obligation.

But because the district court mistakenly concluded that the post-1997 version of § 43-1409[5] governed Brian's claim to disestablish paternity, it gave Brian an opportunity to amend his pleadings and both parties an opportunity to present evidence on the reasons for which § 43-1409 now authorizes a collateral attack on a finding of paternity: duress, fraud, or material mistake of fact.

---

[2] See *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 815, 708 N.W.2d 235, 243 (2006). See, also, *Risor v. Nebraska Boiler*, 277 Neb. 679, 765 N.W.2d 170 (2009).

[3] See Neb. Ct. R. Pldg. § 6-1115(b).

[4] See *Blinn, supra* note 2.

[5] Neb. Rev. Stat. § 43-1409 (Reissue 2008).

That the court ordered an additional hearing is not surprising. The State was relying on a statute that did not exist in 1995 when Brian signed the acknowledgment of paternity, and the court did not know exactly what the paternity statutes provided in 1995. Moreover, in its first order, the court specifically determined that Brian's application to terminate his child support obligation had raised the disestablishment claim and implicitly raised a mistake of fact. So the court's additional hearing was not an attempt to improperly expand the proceeding to include the disestablishment issue. Nor did the court improperly suggest that it would favorably entertain Brian's amended pleading. The State benefited from an opportunity to present evidence on the issues that the court believed were relevant.

More important, the majority's insinuations are simply beside the point. The court was mistaken in its belief that duress, fraud, or material mistake of fact was at issue. In 1995, § 43-1409 provided the following:

> The signing of a notarized acknowledgment, whether under section 43-1408.01 or otherwise, by the alleged father shall create a rebuttable presumption of paternity as against the alleged father. Such a signed and notarized acknowledgment or a certified copy or certified reproduction thereof shall be admissible in evidence in any proceeding to establish support.[6]

Under the 1995 version of the statute, if Brian rebutted the presumption of paternity, he had no obligation to continue paying child support and the State had no right to seek it. It was not until 1997 that the Legislature amended § 43-1409 to require an unmarried man, who could prove that he was not a child's biological or adoptive father, to nonetheless support that child, unless he could also prove that he signed an acknowledgment of paternity because of fraud, duress, or mistake of fact.[7] But the limitations of fraud, duress, or

---

[6] See, Neb. Rev. Stat. § 43-1409 (Cumm. Supp. 1996); 1994 Neb. Laws, L.B. 1224, § 58.

[7] See 1997 Neb. Law, L.B. 752, § 101.

mistake for rebutting the presumption of paternity did not apply to Brian.

A legislative act operates only prospectively and not retroactively unless the Legislature's intent and purpose that it should operate retroactively are clearly disclosed.[8] Statutes affecting substantive matters are not applied retroactively; disputes regarding such rights are governed by the statutes in effect at the time of the disputed transaction or event.[9] The 1997 amendments to the paternity statutes were substantive and do not apply retroactively to an acknowledgment signed in 1995. So that portion of the court's order dealing with a material mistake of fact is superfluous and immaterial to the issue before this court. Obviously, if the district court had known what § 43-1409 required in 1995, it would not have ordered an additional hearing. Instead, it would have realized that the only issue was whether Brian had rebutted the presumption of paternity—which burden he had clearly met.

Having cleared the statutory underbrush, the primary issue, according to the majority opinion, is whether Brian's pleadings were sufficient to put the State on notice of his claim. *Mahmood v. Mahmud*[10] governs that issue. There, we explained that our pleading practices have been liberalized since 2003: "A party is only required to set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Plaintiffs are not required to plead legal theories or cite appropriate statutes so long as the pleading gives fair notice of the claims asserted."[11]

*Mahmood* illustrates that under our liberal pleading rules, we focus on whether the plaintiff's petition or complaint

---

[8] See, e.g., *Smith v. Mark Chrisman Trucking*, 285 Neb. 826, 829 N.W.2d 717 (2013); *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001); *Kratochvil v. Motor Club Ins. Assn.*, 255 Neb. 977, 588 N.W.2d 565 (1999); *Proctor v. Minnesota Mut. Fire & Cas.*, 248 Neb. 289, 534 N.W.2d 326 (1995).

[9] See, e.g., *Smith, supra* note 8; *Young v. Dodge Cty. Bd. of Supervisors*, 242 Neb. 1, 493 N.W.2d 160 (1992).

[10] *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010).

[11] *Id.* at 396, 778 N.W.2d at 431.

was sufficient to give the defendant notice of the claim to be defended against. Even if a plaintiff cites the wrong statute or uses an incorrect form to assert a claim for relief, this error will not preclude a trial court from considering the claim and granting relief when the petition or complaint is sufficient to put the defendant on notice of the plaintiff's claim.

The application of our pleading rules cannot turn on an appellate court's approval or disapproval of the claim presented. The district court did not, as the majority opinion states, "read a disestablishment action into a modification for child support application." That claim was fairly presented—as illustrated by the referee's interpretation, the State's interpretation, and the district court's interpretation of his pleadings.

It is true that a child born out of wedlock has a statutory right to receive support from the child's father.[12] But as we have previously recognized, unmarried men also have substantial rights at stake in proceedings to impose child support obligations.[13] These considerations do not become irrelevant if the obligor later claims that he was the victim of paternity fraud.

Moreover, under the common law, the father of a child born out of wedlock had no duty to support his child.[14] We strictly construe paternity statutes precisely because they are in derogation of the common law.[15] As we have stated, "'A fundamental fact necessary to sustain an order of child support is paternity by the man judicially obligated to pay such support.'"[16] So if the Legislature has determined that an unmarried father can rebut a presumption of paternity, it is not for this court

---

[12] See Neb. Rev. Stat. § 43-1411 (Reissue 2008).

[13] See *Carroll v. Moore*, 228 Neb. 561, 423 N.W.2d 757 (1988), citing *Little v. Streater*, 452 U.S. 1, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981).

[14] See, *Timmerman v. Timmerman*, 163 Neb. 704, 81 N.W.2d 135 (1957); *Carlson v. Bartels*, 143 Neb. 680, 10 N.W.2d 671 (1943).

[15] See, *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999); *Timmerman, supra* note 14.

[16] *Cross, supra* note 15, 257 Neb. at 781, 600 N.W.2d at 784.

to sit as a super-legislature and discourage such actions by imposing stricter pleading requirements than the pleading rules that apply in any other proceeding.

It is true that in *State on behalf of L.L.B. v. Hill*,[17] the trial court sustained a motion to vacate a paternity decree that it had entered several years earlier. But in *Hill*, we did not address the court's authority to grant this equitable relief or to terminate future support obligations. The only issue on appeal was the court's vacation of arrearages, and we concluded that the adjudicated father's lack of diligence precluded him from seeking that relief.

But setting aside a paternity decree under a district court's equity jurisdiction is contrary to our cases holding that equitable relief is not available under the paternity statutes.[18] Moreover, Nebraska does not have a procedural equivalent of rule 60 of the Federal Rules of Civil Procedure,[19] which permits a court to grant prospective relief from a judgment because it is no longer equitable. Finally, if the majority actually believes that a district court has equity powers to grant prospective relief from a paternity decree, it should be interpreting the court's order as doing just that. But that issue need not be reached because the obvious remedy, for petitioners like Brian at least, is § 43-1409, as it existed in 1995.

The majority concedes that the only basis for the paternity decree is Brian's acknowledgment and that § 43-1409 provides a method to rescind or challenge such acknowledgments. In 1995, there was no time limitation for that challenge. But the majority attempts to evade that problem by concluding that in 1995, § 43-1409 created merely an evidentiary presumption for a proper proceeding, but not a remedy. The majority clearly believes that when Brian signed the acknowledgment, no statutory procedure existed for challenging a finding of paternity if the acknowledged father initially believed he was

---

[17] *State on behalf of L.L.B. v. Hill*, 268 Neb. 355, 682 N.W.2d 709 (2004).

[18] See, e.g., *Paltani v. Creel*, 169 Neb. 591, 100 N.W.2d 736 (1960); *Timmerman, supra* note 14; *Carlson, supra* note 14.

[19] See Fed. R. Civ. P. 60(b)(5).

the father or could not afford to challenge a paternity petition. I do not agree that the Legislature intended to permit an acknowledged father to rebut a presumption of paternity but nonetheless left him high and dry, without a procedure for asserting that challenge.

Moreover, if no procedure existed for challenging a paternity finding, then in 2008, the Legislature had no need to prohibit a court from granting relief from a determination of paternity if the petitioner had signed an acknowledgment.[20] Notably, the 1995 acknowledgment that Brian signed did not inform him that he would be unable to challenge the acknowledgment even if he later learned that he was not the child's biological father. The only constructive notice he had of the acknowledgment's consequences was § 43-1409. That statute would have reasonably led him to conclude that he could challenge the acknowledgment by rebutting the presumption of paternity.

One more point, and I am done. I recognized that the State alternatively argues that Brian should be equitably estopped or barred by the doctrine of laches from challenging his paternity because he sat on his rights until the minor, B.M., was nearly 17 years old. But even if equitable relief were available under the paternity statutes, equity strives to do justice.[21] And the State's argument ignores the fact that adjudicated fathers are commonly low income and without the means to prove their claims if they later learn they are not the biological father.[22] This record certainly suggests that Brian lacked the wherewithal to defend his rights.

Although Brian had suspicions that he might not be the minor's father, he was living in Minnesota when he was served with notice of the State's paternity action and did not appear for that proceeding or for the subsequent 2009 modification

---

[20] See Neb. Rev. Stat. § 43-1412.01 (Reissue 2008).

[21] *Floral Lawns Memorial Gardens Assn. v. Becker*, 284 Neb. 532, 822 N.W.2d 692 (2012).

[22] See, e.g., Tonya L. Brito, *Fathers Behind Bars: Rethinking Child Support Policy Toward Low-Income Noncustodial Fathers and Their Families*, 15 J. Gender Race & Just. 617 (2012).

proceeding. But in 2009, when the minor was removed from his mother's home, the payee for Brian's support payments was changed to a man whom the mother had stated was the minor's biological father. After Brian found out he was not the minor's father, he tried to do something about his support obligation. He stated that he unsuccessfully asked for genetic testing for years from child support services. He eventually received help with court filings from legal aid services in Minnesota, which resulted in the 2012 order for genetic testing, followed by his disestablishment claim. I do not believe that these facts show inexcusable neglect.

More important, equitable relief is not available under the paternity statutes. As explained, these statutes are strictly construed because they are in derogation of the common law. The parties are limited to the remedies provided by statute, which do not include claims for equitable relief.[23] So under the 1995 version of § 43-1409, the State may not continue to seek support from an unmarried father who rebuts a presumption of paternity.

In sum, the majority's opinion appears to be a triumph of form over substance. It concludes that Brian's pro se filings were insufficient to present a disestablishment claim despite the State's interpreting his pleadings as presenting this claim and defending against it; despite the referee's specific statement that the matter before him was Brian's June 2012 pleading; despite the district court's interpretation of his pleadings as presenting alternative claims for relief; and, most important, despite our own pleading rules and case law that require this court to decide the issues presented by this appeal.

The majority has effectively held that all adjudicated fathers signing an acknowledgment before 2008 have no procedure to overcome the "res judicata" effect of the paternity decree and prove that they are not the acknowledged child's biological father. Under the majority opinion, a man who is not the child's father can be coerced to make future support payments to a man who is the child's father, even upon a demonstrated

---

[23] See, e.g., *Paltani, supra* note 18; *Timmerman, supra* note 14; *Carlson, supra* note 14.

falsehood. This result demonstrates that without a remedial procedure in place, hospital acknowledgments of paternity easily become a child support system that is unconcerned with actual paternity.[24]

McCormack, J., joins in this dissent.

_____

[24] See Ronald K. Henry, *The Innocent Third Party: Victims of Paternity Fraud*, 40 Fam. L.Q. 51 (2006).

_____

State of Nebraska, appellee, v. Yai Bol, also known as Daniel D. Matit, appellant.

___ N.W.2d ___

Filed May 16, 2014.    No. S-13-317.

1. **Constitutional Law: Search and Seizure: Investigative Stops: Arrests: Probable Cause.** The Fourth Amendment guarantees the right to be free of unreasonable search and seizure. This guarantee requires that an arrest be based on probable cause and limits investigatory stops to those made upon an articulable suspicion of criminal activity.

2. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, the appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that the appellate court reviews independently of the trial court's determination.

3. **Criminal Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** A traffic stop requires only that the stopping officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime.

4. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** If an officer has probable cause to stop a traffic violator, the stop is objectively reasonable.

5. **Investigative Stops: Police Officers and Sheriffs: Probable Cause.** In determining whether there is reasonable suspicion for an officer to make an investigatory stop, the totality of the circumstances must be taken into account.

6. **____: ____: ____.** The factual basis for an investigatory stop need not arise from the officer's personal observation, but may be supplied by information acquired from another person.

7. **Investigative Stops: Arrests: Police Officers and Sheriffs: Probable Cause.** Under what is commonly called the collective knowledge doctrine, an officer who does not have personal knowledge of the facts establishing probable cause